## Case No. 13,634.

### The SUSAN G. OWENS.

. [2 Am. Law J. (N. S.) 179.]

District Court, E. D. Pennsylvania. 1848.

ADMIRALTY—LIEN FOR SUPPLIES.

[The agents of the owners of a ship registered in Baltimore, where the owners resided, made a contract, at Philadelphia, for the sale of the ship to H. & S., not residents of Philadelphia; the title to the ship to be transferred to them on full payment of the price. H. & S. caused extensive improvements to be made to the ship and supplies furnished to her at Philadelphia. They were unable to complete their contract, and assigned it to other persons. to whom the legal title to the ship was transferred by the owners, and by whom she was registered anew at Philadelphia. Held, that the ship chandlers and material men and the stevedore who stowed the cargo and stores were entitled to liens against the ship for the goods and services furnished and rendered to the ship, upon the invitation of H. & S., before the transfer to the assignees of their contract.] ·

In admiralty.

Mr. Barns. Mr. Van Dyke, and Mr. Donegan, for libellants.

G. M. Wharton and Mr. Kennedy, for respondents.

KANE, District Judge. The ship Susan G. Owens was registered in the district of Maryland, as the property of citizens resident thereof. On the 21st of February last, then being at the port of Philadelphia, she was made a subject of an agreement between certain persons as agents for the owners and Messrs. H. P. & S. S. Townsend. The agreement was as follows: "We, Mason, Kirkland & Co., of Philadelphia, agents for the owners of the ship Susan G. Owens, burthen 730 $^{10}/_{95}$ tons, lying in this port. do. by these presents, sell said named ship to Messrs. H. P. & S. S. Townsend, for the sum of fifty-four thousand dollars, to be paid in hand by them to the said Messrs. Kirkland & Co., in the following sums and periods as here stated, viz.: ($10,000.) Ten thousand dollars to be paid within 15 days from this date, February 21. (10,000.) Ten thousand dollars to be paid within 25 days from this date. (29,000.) Twenty-nine thousand dollars to be paid within 35 days from this date. (5,000.) Five thousand dollars to be paid in hand on the signing of this contract. And the said sum ($54,000) to be considered as deposited in the hands of Mason. Kirkland & Company, for the faithful performance of the said stipulation. And we, the said H. P. & S. S. Townsend. do, by these presents. agree to forfeit all our right, title and interest in the said sum of $5,000, and any further sums as they may be paid in, and also of all claim of ownership in said vessel, provided that we should fail to perform our portion of this contract as named. On the faithful completion of the terms of this contract, Mason, Kirkland & Co. bind themselves, by these presents, to have the said ship Susan G. Owens, legally transferred to Messrs. H. P. & S. S. Townsend. Witness our hands and seals this twenty-first day of Feb., A. D. 1849. Mason, Kirkland, & Co. (L. S.) H. P. & S. S. Townsend. (L. S.) Witness: H. Frank Robinson. D. C. Landis."

The Messrs. Townsend appear to have been in Philadelphia at the time of executing this instrument, but they had no domicil here in

any sense, commercial or other. In fact, it would seem that they were merely adventurers who came here for the occasion, one of them intending to take passage in the ship for California, which was to be its destination. They proceeded immediately to fit her out as a passenger ship, on a very expensive scale, and to lay in supplies and stores for a two years voyage. What her employment was to be after arriving out, does not clearly appear; whether she was to remain there as a receiving ship, or to trade as a packet along the western coast; but the outfit was intended to be adequate to either object. The contracts with the material men and others were not made by the Townsends in person. The captain sometimes alone, sometimes in company with the father of one of the partners who acted as agent of the concern, gave the orders, and they were executed as it appears in all cases on the credit of "the vessel and her owners." Their means and credit were very soon exhausted. They paid $5,000 upon the execution of the agreement which I have recited; but when the first instalment fell due—fifteen days after—they were only able to pay one-fourth of it. And at some early period of their transactions, they were glad to borrow $500 from one of the libellants. At last, on the 25th of April, finding themselves altogether unable to prosecute their intentions, and the vessel having been attached in this court, at the instance of numerous libellants, they assigned their contract of purchase to the present claimants for the sum of $25,000, and the vessel was registered anew in the port of Philadelphia, as the property of residents of this district; the entire ownership of the ship and her outfits vesting accordingly in them. The demands before the court are against the ship, her tackle and apparel by ship chandlers and other material men, and by the stevedore who stored the cargo and stores; all of them founded on contracts made before the transfer of the 25th of April. They are resisted upon the ground that the vessel was a domestic vessel in her home port, where the owner was at the time of contracting, and that therefore she was not liable upon an implied lien for supplies or stowage services.

The other points which were made in the case, I do not think it necessary to consider. What is meant by ship chandlery in the Pennsylvania act of assembly, and whether a domestic vessel is, or is not, specifically liable to the stevedore, were questions elaborately and ably discussed in the argument; and so was the other question, whether the opinion of the supreme court in the case of The General Smith, 4 Wheat. [17 U. S.] 438, is to be regarded as conclusively establishing the distinction between foreign and domestic ships, as to a specific liability for repairs and out-fits. It would not perhaps be difficult to decide all of these questions; but it will be time enough to do so when they shall be necessarily involved in the determination of a cause

before the court. But the present does not seem to be the case either of a domestic vessel, or of a vessel domestic or foreign, contracting through the instrumentality or in the presence of the owners. The vessel was registered in a foreign port, and her legal owners resided there. The Townsends had only an equitable and contingent, or at best, a defeasible interest in her; and moreover, they were not residents of this district. Now, whether we turn to the law maritime of the world, or to the modification of it which is asserted in the case of The General Smith, there can be no doubt but that a vessel thus circumstanced becomes liable for repairs and supplies generally. The general maritime law recognizes no distinction in this respect between foreign and domestic vessels. Both are liable on the civil law principle that whoever has contributed to the preservation, or the increased value of property, has a privilegium in it for the amount due to him in return.

The distinction which has been admitted into our law on this subject is not found, that I am aware of, in either the ancient or modern law of any other country. The Consulado, c. 32, as quoted by Boulay Paty (1 Cours de Droit Mar. 121),[1] says, that "if a new vessel before making her first voyage is sold at the instance of creditors, the carpenters, caulkers, and other workmen, as well as the persons who have furnished the timber, the pitch, the spikes, and other things necessary for her construction, shall be preferred to all other creditors whatsoever." The Guidon, c. 9, § 1, says: "The debts contracted by the master of a ship for repairs, provisions, supplies, or other things for voyages (entrepris) determined on, have a special hypothecation in their favor upon the proceeds of the freight, in preference to anterior debts, whether by hypothecation or otherwise." 2 Pard. Lois Mar. 424. The laws of the Hanseatic League (Anno 1614), tit. 5, § 7, authorize the captain in case a part owner shall refuse to take up his share of the out-fit, to take up such amount as may be needed, on the credit of the vessel and on the profits of the voyage, and to hold his share of them answerable jointly, with those of the other part owners. 2 Pard. Lois Mar. 546. A provision altogether similar is found in the Maritime Code of Sweden (Anno 1667), pt. 3, c. 2, and is applied with appropriate modifications to the case of advances for the construction of the vessel and the payment of the crew. Part 4, c. 9, of same Code; 3 Pard. Lois Mar. 160, 161, 169. So too by the Danish Code of 1683, bk. 4, cc. 5, 59, the vessel is specially hypothecated for all moneys lent for the construction of the ship, or the support of the

---

[1] I quote from Boulay Paty, because the arrangement and notation of the chapters of the Consulado are not uniform in the different editions, and I am unable at the moment to find the original passage in Pardessus' translation, which is the only one accessible to me.

workmen engaged in building her; and this privilegium continues and may be enforced until she has sailed on her first voyage. 3 Pard. Lois Mar. 301. The Water brieven hypothecation of the Netherlands, for which a remedy is given by the Ordonnance of Gordrecht (Anno 1533), is to the same effect. See 4 Pard. Lois Mar. 165, 167, and the notes. The Ordonnance of Louis 14 (Anno 1681), which Judge Washington recognized in the case of The Seneca [Case No. 12,670], as a compend of the law maritime of the world in arranging the order in which privileged debts shall be paid, (book 1, tit. 16,) enumerates as well advances for repairs and out-fit before departure, as for necessaries furnished abroad. And Valin, in his commentary on this title, (volume 1, 363), says, that this of course includes the debts due to all those mechanics and others who have supplied necessaries for the voyage. Emerigon (Contract Gr. Avent. §§ 3, 4) does the same; and he is followed by Boulay Paty (1 Cours. Dr. Mar. 121, 122), who adds that the modern law of France is to the same effect. All these writers give, indeed, a different and higher rank to the privilegia which accrue, pending the voyage, than to those originating in the home port; but they unite in awarding a preference to both over the general creditor, or the party claiming under an elder bottomry bond. The modern law of Holland agrees with this (see Lord Hardwicke's opinion in Ex parte Shank, 1 Atk. 234), and indeed, after looking with some care through the different maritime codes of Europe, as collected by Pardessus, I do not know that any commercial state on the continent refuses to the material man any implied lien on a domestic more than on a foreign ship. In England and Scotland the same rule obtained as on the continent during a long series of years; the admiralty enforcing the liens. The agreement made at Whitehall, 18 Feb. 1632, by all the judges, before the king and privy council, § 3 (Godol. 157), expressly negatives the right of the common law courts to issue writs of prohibition in such cases. Even as late as the year 1777, Lord Mansfield, in the case evidently of a domestic vessel (Rich v. Coe, Cowp. 639, 640), declared that by the English law, "whoever supplies a ship with necessaries has a treble security: (1) The person of the master; (2) the specific ship; and (3) the personal security of the owners, whether they know of the supply or not. And in deciding that the owners in that case were liable notwithstanding some special circumstances, he argues that the unquestioned liability of the ship, is enforced by the admiralty process. "Suppose the ship," he says "had been impounded in the admiralty court, the defendants could never have taken the ship out of the court without paying the debt for which the ship was impounded." I know, indeed, that prohibitions had issued before this period, to restrain the English admiralty from entertaining the claims of material men,

and that of later years, that court has very reluctantly foregone the exercise of this branch of its ancient jurisdiction. But the English cases did not formerly, nor do they now, recognize a distinction in this respect, between foreign and domestic ships, except in so far as they are based on the statute of 3 & 4 Vict. c. 65. Both are equally excluded from liability to an implied lien for materials and supplies by the law of England, as both are equally made subject to such a lien by the general law of the sea. See the cases collected in Abb. Shipp. pt. 2, c. 3.

The case of The General Smith [supra], established for the United States a rule on this subject differing, I humbly conceive, as much from that of the English as that of the continental courts. It is this: "Where repairs have been made or necessaries furnished to a foreign ship, or to a ship in a port of the state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for his security, and he may well maintain a suit in rem in the admiralty to enforce the right. But in respect to repairs and necessaries in the port or state to which the ship belongs, the case is governed altogether by the municipal law of that state, and no lien is implied unless it is recognized by that law." Per Story, J., delivering the opinion of the same case, 4 Wheat. [17 U. S.] 438 It is not perhaps altogether easy to harmonize the language in which this opinion is expressed, with the remarks of Judge Johnson in delivering the opinion of the same court in The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409. Judge Story, it may be observed, derives the lien in the case of a foreign ship from the civil law as adopted into the Maritime Code of Nations.—Now, by that Code, the master can hardly be said to acquire his authority to constitute implied liens for either out-fits or repairs from his character of præpositus or agent of the ship owner. He is indeed regarded in that character by the Roman law, and as such he may bind not only the specific ship, but the owners in solido, and even make them liable for his delicts; this authority being implied from necessity, and therefore suspended while the exercitor—his constituent, is present. But the qualified power of the master under the law maritime, while it is much more limited in some respects, is in others more ample, or at least less dependent. Thus on the one hand his power extends only to a charge upon the ship, and that for legitimate contracts; the owner may avoid personal liability by abandoning his interest. But on the other hand his authority as manager (gerante) or representative of the ship and its interests, being specific as to them, continues so far as regards these implied liens, whether the owners be present or absent. See the argument of Judge Ware, in The Phebe [Case No. 11,064], and such I understand from the language of Judge Story, on many occasions, to have been his meaning in the case

of The General Smith. The reasoning of Judge Johnson, however, in the case of The St. Jago de Cuba [supra], refers the master's power to a somewhat different theory, and applies to it a different limitation accordingly. "The necessities of commerce require, he says, that when remote from the owner, the master should be able to subject his owner's property to that liability, without which it is reasonable to suppose he will not be able to pursue his owner's interests. But when the owner is present, the reason ceases, and the contract is inferred to be with the owner himself on his ordinary responsibility without a view to the vessel as the fund from which compensation is to be derived." But whether we take the law as it is laid down by the court in the case of The General Smith, or limit it as was done in that of The St. Jago de Cuba, the result as to The Susan G. Owens is the same. Where did she belong? and who were her owners? Her register, the document by force of which she has any national or home character whatever, without which she is alien every where, declares that she belongs to Baltimore. The act of congress, under which this registry was made, enacts that on a change of the ownership a corresponding change shall be made in the register;—no such change was made.

The grand bill of sale, the universally accepted and looked for evidence of a transferred title to ships and vessels, required not merely by a municipal regulation, but as Sir Wm. Scott says, in The Sisters, 5 C. Rob. Adm. 155 (Am. Ed.) by the universal law of the sea, is not made: the registered owners stand out to the world as the owners and only owners. And thus, holding the legal title, they first permit the libellants on the invitation of third persons, to make and perform contracts for repairing and out-fitting the vessel, which add largely to her value; and then, they or their grantees (for the claimants here are only grantees of the former registered owners, and do not affect to come here in any other capacity,) they come here in full possession and enjoyment of the vessel thus largely meliorated, and claim that neither they nor their vessel shall be held liable for the price of the repairs and out-fits so furnished her. The material men are to look, not to the legal owner at the time of their contract, not to the legal owners now, not to the vessel itself—but to certain conduit-pipes of an equitable, contingent, defeasible interest—cosmopolitan gentlemen who were to have been the owners, had they been able to complete their bargain or had not found it more safely profitable to assign it away. The very statement of such a defence is enough. If the lien of a material man could be avoided by an arrangement like this, it might as well rest at once upon the ship owner's honor. It would only be necessary for him to vest for the time some equitable interest in the captain of his ship, and she might visit every port of the United

States in succession, and collect supplies at them all without incurring a liability. Every port would be a home port for her.

But even regarding the Townsends as the owners, the argument of the defence is not less inconclusive. Because these gentlemen are residents no where else, it can hardly be said to follow that they must be domiciliated here; and if the home port of the vessel is dependent on the domicil of the owner, may we not be led to the conclusion that both are homeless alike. Certain it is, that the argument would exempt a vessel from liability to a specific lien precisely in those cases in which such a lien is most needed—the cases namely in which she is most unequivocally a stranger to the port, and personal recourse against her owners least available. I cannot find anywhere the warrant for so marked a departure from the established policy of the maritime law. It is emphatically the law of fair dealing and well protected confidence;— looking with a liberal spirit to the general interests of navigation, holding foreigners and citizens as members alike of that great community in which commerce has united mankind, securing credit and aid to the ship owner every where, by securing payment to all who trust upon the credit of his ship, but watching jealously against oppression and fraud, however masked or tricked off in the semblance of legal formulas. Such is its policy; and I am constrained to add that I have rarely known it more essentially contravened than it would by sustaining this defence.

The decrees must be for the libellants, with full costs,—in the case of McDermott, in the amount claimed by him; in the other cases, the amount to be ascertained by a commissioner from the evidence upon the files. I have no doubt upon the proofs as to the other facts which have been controverted in the cause. Decrees accordingly.

[On appeal to the circuit court, the above decree was affirmed. Case No. 17,310.]